Arnold Guy Fraiman, J.
This is an article 78 proceeding brought by MHG Enterprises Inc., which maintained and operated an amusement park in Flushing, New York, known as the Great Adventure Amusement Park, to compel respondents to pay its relocation costs arising out of the condemna *843 tion of the land on which the amusement park was situated. The property for which it seeks relocation costs consists principally of amusement park rides and equipment. The land was condemned as part of the College Point Industrial Park Urban Renewal Project. Respondents are the City of New York, the city’s Public Development Corporation, the Housing and Development Administration and the Department of Relocation. Pending the determination of this matter, respondents have been stayed from moving, damaging, selling or otherwise disposing of MHG’s property on the site. Respondents have counterclaimed for unpaid rental payments allegedly due and owing from MHG from as early as December, 1972.
The land on which the amusement park was situated is roughly divided by a stream known as Mill Creek. The area north of Mill Creek was owned by the city prior to condemnation, title originally vesting in 1955 following an in rem proceeding. It was leased to MHG pursuant to a written "month-to-month” lease entered into between the city and MHG on March 29, 1971. Title to this portion of the land revested in the city pursuant to a condemnation order on December 1, 1972. Title to the area south of Mill Creek vested in the city on April 3, 1974 by an order of condemnation on that date. Prior to its condemnation, this area was owned by a partnership affiliated with MHG. No claim for relocation benefits is being made with respect to this parcel of property.
MHG, in resisting its removal from the subject premises, has engaged in extensive litigation which culminated in a consent order wherein it agreed to vacate part of the premises in March, 1975 and the remainder of the area by November 1, 1975. However, MHG subsequently obtained a number of stays until April 29, 1976, when it was constructively evicted from the premises by the Sheriff. However, the city did not enter into possession of the premises until May 28, 1976. In certiorari proceedings in Supreme Court, Queens County, the court (Castaldi, J.) held on November 3, 1975 that the rides and equipment were personalty and not fixtures and that MHG was therefore not entitled to an award in condemnation for such property. No appeal has as yet been taken from that order, although a notice of appeal was filed by MHG.
The obligation of the city to provide relocation services, including the payment of costs, is set forth in section 1160-1.0 of the Administrative Code of the City of New York. This provides in relevant part as follows:
*844 "Relocation of tenants. — 1. The commissioner shall have the power and it shall be his duty:
"(a) To provide and maintain tenant relocation services
"(i) for tenants of real property which the commissioner of real estate is authorized to maintain and supervise; and
"(ii) for tenants of real property acquired for public purposes, excluding real property acquired by or on behalf of the New York city housing authority or the triborough bridge and tunnel authority; and * * *
"Such services shall consist of such activities as he may deem necessary, useful or appropriate for the relocation of such tenants, including but not limited to the gathering and furnishing of information as to suitable vacant accommodations, the making of studies and surveys for the purpose of locating such accommodations and the provision of facilities for the registration of such accommodations with the department by owners, lessors and managing agents of real property and others.”
Section 1160-1.0 (subd 1, par [b]) states that the Commissioner of the Department of Relocation shall also "fix and promulgate and from time to time amend a schedule of payments to be made to or for the benefit of and to aid in the relocation of tenants.” Paragraph (b) of subdivision 1 further provides that: "Such schedule shall provide for equal treatment of tenants under similar circumstances, shall be applicable as herein provided and may include but need not be limited to payments to be made to such tenants to induce their voluntary removal, moving expenses and expenses of redecorating accommodations to which such tenants are relocated and payments to persons for the services of finding accommodations to which such tenants are to be relocated.”
MHG initially sought relocation benefits under section 1160-1.0 in March, 1976. However, by letter dated April 21, 1976, the Department of Relocation rejected its application. Basis for the rejection was that the city had acquired valid title to the area north of Mill Creek in 1955 and that the condemnation proceedings culminating in the order of December, 1972 was for the purpose of clearing title only. The city therefore concluded that petitioners were not "tenants of real property acquired for public purposes” within the intendment of section 1160-1.0 (subd 1, par [a], cl [ii]) and thus were not entitled to relocation benefits. Thereafter, MHG commenced an article 78 proceeding seeking to overturn the department’s determina *845 tion. This was denied by the Honorable Charles Tierney on the ground that petitioner had failed to exhaust its administrative remedies. MHG then returned to the Department of Relocation and appealed to the commissioner from the April 21 determination. On July 15, 1976 the commissioner, through a designated hearing officer, issued a final order upholding the April 21 determination. MHG has now commenced the instant proceeding. Basis for the application is that respondents’ refusal to accept its claim for relocation costs is arbitrary and capricious and contrary to law and constitutes an abuse of discretion.
In support of its position, MHG contends that it is entitled to benefits under the clear language of section 1160-1.0 (subd 1, par [a], cl [i]) which mandates that the Commissioner of Relocation provide tenant relocation services "for tenants of real property which the commissioner of real estate is authorized to maintain and supervise.” As a month-to-month tenant of the city, it argues that it comes within the plain meaning of this provision. Further, it contends that past and present practices of the Department of Relocation dictate a finding that it is entitled to relocation benefits. Specifically, it notes that relocation costs have already been paid to at least three other month-to-month tenants formerly occupying premises which were condemned as part of the College Point project.
In opposition to MHG’s application, respondents basically make two arguments: first, they maintain that under the lease between the city and MHG, MHG’s tenancy was terminable at will and the cost of moving was to be borne by the tenant when the tenancy was terminated. Second, they argue that in order to be eligible for relocation benefits a tenant must not only qualify under one of the subdivisions of section 1160-1.0 (subd 1, par [a]) of the Administrative Code, but also must be eligible under the Relocation Department’s own rules and regulations. While conceding that MHG meets the requirements of section 1160-1.0 (subd 1, par [a], cl [i]), they contend that MHG comes a cropper under relocation regulations. Amendment No. 4, section 6.104, of the department’s regulations, entitled "Basic Eligibility Conditions for Relocation Payments”, provides as follows: "In order to qualify for benefits as a displaced person all the following conditions must be fulfilled: 1. The real property in which the person does business must have been acquired by the City of New York; and the person must have moved as a result of its acquisition. 2. *846 The person must be an occupant of the real property on the date title vested in the City of New York. 3. Displacement is made necessary by the acquisition of such real property by the City of New York.” Respondents argue that MHG fails to meet all of these criteria because it was not an occupant of the premises on the date title vested in the city in 1955. They claim that the city took title from itself in 1972 pursuant to the condemnation proceedings purely for administrative purposes, "e.g. to clear any possible easements; to reallocate budget lines,” and that the 1955 vesting date, prior to MHG’s tenancy, rather than the 1972 date, should be used for the purpose of determining MHG’s eligibility under the department’s regulations.
Assuming, without deciding, that a tenant must comply not only with section 1160-1.0 (subd 1, par [a]) but also the Department of Relocation’s own rules and regulations in order to qualify for relocation benefits, the court is satisfied that MHG meets the criteria for both. As noted, respondents concede that MHG was a tenant of real property maintained by the commissioner of real estate, and therefore complied with 1160-1.0 (subd 1, par [a], cl [i]). It was also an occupant of the premises "on the date title vested in the City,” within the meaning of that phrase as contained in the department’s regulations. In interpreting the language of a statute or regulation, the court must give meaning to its words "in the context of their particular setting.” (MVAIC v Eisenberg, 18 NY2d 1, 3.) The rules of statutory construction do not permit the segregation of a few words from the overall context of the legislative design. (Matter of Albano v Kirby, 36 NY2d 526, 530.) Accordingly, the regulation here in question relating to the vesting of title must be read in the context of the Department of Relocation’s specific function, which is to aid tenants who are involuntarily displaced from their homes or businesses by the city. While it is true that MHG was not an occupant of the area north of Mill Creek when title originally vested in the city in 1955, it was such a tenant in 1972 when, for reasons best known to it, the city retook title to the area pursuant to an order of condemnation. And it was this latter revesting of title in the city which has forced MHG to relocate. Thus, MHG is clearly within the intended class of tenants the Department of Relocation was created to assist. As the department’s own Relocation Guide for Business Concerns and Nonprofit Institutions on Public Improvement and *847 City Urban Renewal Projects provides: "Every tenant displaced from a * * * City Assisted Urban Renewal Area is entitled to and will receive fair, courteous and complete service and benefits from the Department and its employees.” (Relocation Guide, p 2.)
Nor can respondents deny MHG relocation benefits because it was a month-to-month tenant and under its lease it was obligated to assume its own moving costs upon termination of its tenancy by the city. The lease provided that it could be terminated by the city by serving upon the tenant a 30-day notice to terminate the tenancy. However, the city did not choose to avail itself of that method of ousting MHG. Instead, it proceeded by way of condemnation. Having made that election, it cannot rely upon a clause in the lease applicable only when it was terminated in the method provided therein, in order to deny MHG relocation benefits. For the foregoing reasons, the court finds that MHG is entitled to relocation costs, and its petition is granted. In so holding, the court is mindful that the Department of Relocation has already afforded such benefits to several other tenants who were in substantially similar circumstances to MHG, and as section 1160-1.0 (subd 1, par [b]) of the Administrative Code, quoted above, provides, the schedule of payments made in the relocatin of tenants "shall provide for equal treatment of tenants under similar circumstances”.
One further matter must be considered in connection with this proceeding. Respondents contend that MHG was, in effect, a squatter on certain of the land it occupied in the area north of Mill Creek, and that should the court determine that it is entitled to relocation costs, these should not include the costs of relocating amusement rides and equipment situated on the so-called squat land. MHG, on the other hand, maintains that its lease with the city, as modified, encompassed all the land north of Mill Creek on which its rides were located, and that it is entitled to relocation costs for all its personalty in the area. MHG’s original month-to-month lease covered approximately 78,000 square feet and provided for a monthly rental of $425. The premises were to be used for a parking lot and for storage of trucks and vehicles. But at some point in 1971 MHG apparently placed a few amusement rides on the leased area and converted the use to an amusement park. It also placed rides on adjacent land also north of Mill Creek, which was not included in its lease. In the certiorari proceedings *848 before Mr. Justice Castaldi, there was testimony by a property manager in the Department of Real Estate that he regularly inspected leased property once or twice a month, and the court found that the city was aware of the fact that MHG was using the premises as an amusement park as early as late 1971 or early 1972, and made no objection thereto. However, on April 21, 1974, in a so-called "Rent Advice” the Department of Real Estate increased MHG’s monthly rental, "Because of additional space of parking area now being used as amusement-portable rides.” On the basis of this evidence, the court concludes that the city was aware not only of MHG’s altered use of the leased land, but also of its placing amusement rides on the so-called squat land, and acquiesced therein, ultimately formalizing the de facto change in the lease by its "Rent Advice” of 1974. Accordingly, MHG is entitled to relocation costs on all its personalty situated north of Mill Creek.
Finally, a word must be said concerning an allegation by respondents that MHG placed amusement rides on the premises after the land had been condemned, and it should not be paid relocation costs for such personalty. However, in an analogous context, where the issue was whether a property owner was entitled to an allowance for fixtures which had been placed on the property aftér a notice of condemnation was received, the court held that the owner was so entitled so long as he acted in good faith and not with an intent to increase the amount of his damages. (Matter of the City of New York [Briggs Ave], 196 NY 255.) Here, assuming respondents’ allegation is correct, there is no evidence that MHG acted in bad faith, and it stretches the imagination to believe that it would deliberately move rides onto the premises solely for the purpose of being compensated for removing them.
Settle judgment providing for the severance of respondents’ counterclaim and setting it down for trial and the remand of this matter to the Department of Relocation for the purpose of fixing relocating costs for petitioner in accordance with its schedule of payments. In this connection, the Department of Relocation shall not be obligated to pay petitioner any warehousing costs, in view of the substantial period of time MHG has had to determine where it wishes to relocate its property.